**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANDI GJOCI**, *et al.*, | |
| *Plaintiffs*, | |
| **v.** | Case No. **1:21-cv-00294-RCL** |
| **DEPARTMENT OF STATE**, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OPINION**

Plaintiffs are individuals hoping to receive a diversity visa, a document that will permit them to travel to a port of entry and request permission to enter the United States. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 158 (D.D.C. 2020); 8 U.S.C. § 1201(h). They were selected out of a highly competitive lottery and, by statute, will remain eligible to receive a visa until September 30, 2021. *See Almaqrami v. Pompeo*, 933 F.3d 774, 776–77 (D.C. Cir. 2019). In their original complaint and accompanying motion for a preliminary injunction, plaintiffs accused defendants—federal government entities charged with administering the diversity visa program—of unlawfully suspending diversity-visa processing. ECF No. 1; ECF No. 6. But after the complaint was filed, diversity visa processing resumed. Accordingly, this Court denied plaintiffs' previous request for a preliminary injunction without prejudice based on the "mismatch" between plaintiffs' complaint and the request for injunctive relief. *See* ECF No. 30; ECF No. 31.

Shortly thereafter, plaintiffs amended their complaint and again moved for a preliminary injunction. ECF No. 33; ECF No. 35. Plaintiffs purport to challenge both the former cessation in diversity visa adjudications *and* defendants' current COVID-19 guidance governing visa processing. Defendants filed an opposition in which they contend, among other things, that

1

plaintiffs' claims are not justiciable.  ECF No. 39.  Plaintiffs filed a reply in support of their motion. ECF No. 41.  The motion for a preliminary injunction is now ripe for review.

Upon consideration of the parties' filings and the underlying record, the Court will deny plaintiffs' second motion for a preliminary injunction.

## BACKGROUND

### A.  The Diversity Visa Program

Generally, a foreign national wishing to enter the United States must first obtain a visa from the State Department, which is then placed on the traveler's passport.  A visa is "a travel document that allows its holder to travel to a port of entry and request permission to enter the United States, but it does not guarantee the right to enter the country."  *Gomez*, 485 F. Supp. 3d at 158; *see* 8 U.S.C. § 1201(h); *Trump v. Hawaii*, 138 S. Ct. 2392, 2414 (2018) (identifying "the basic distinction between admissibility determinations and visa issuance that runs throughout the [Immigration and Nationality Act]").

There are two overarching categories of visas: nonimmigrant and immigrant. Nonimmigrant visas are issued to foreign nationals seeking to enter the United States on a temporary basis for tourism, business, medical treatment, and certain types of temporary work. Immigrant visas are issued to foreign nationals intending to relocate permanently to the United States.  *See United States v. Idowu*, 105 F.3d 728, 731 (D.C. Cir. 1997); *Gomez*, 485 F. Supp. 3d at 158.

This case concerns diversity visas, a type of immigrant visa under the Immigration and Nationality Act ("INA").  Each fiscal year, Congress reserves 55,000 diversity visas for randomly selected individuals from countries that are historically underrepresented in the United States' immigration process.  *See* 8 U.S.C. § 1151(e), *id.* § 1153(c)(1).  The process is "competitive and complicated."  *Almaqrami*, 933 F.3d at 776.

First, an applicant must apply for and win the diversity visa "lottery."  § 1153(e)(2); 22 C.F.R. § 42.33(b)–(c).  The chances of being selected in the lottery are slim.  In Fiscal Year 2018 there were approximately 14.7 million qualified entries.  ECF No. 33 ¶ 310.  Next, a lottery winner or "selectee" must submit documentation (including form DS-260) to be eligible for a visa number, a device used by the State Department to ensure it does not grant more than the 55,000 diversity visas each year.  22 C.F.R. §§ 42.33(f)–(g), 42.51–55; 9 Foreign Affairs Manual ("FAM") 502.6-4(c)(2)(C), (d).  A selectee is eligible to receive a visa number only during the fiscal year in which he applied and was selected.  8 U.S.C. § 1153(e)(2); 22 C.F.R. § 42.33(f).  Visa numbers are issued "strictly in a random order."  8 U.S.C. § 1153(e)(2); 22 C.F.R. § 42.54(2).

The Kentucky Consular Center ("KCC") is responsible for several aspects of diversity visa processing, including the issuance of visa numbers.  ECF No. 20-2 at 1.  After receiving and processing a selectee's form DS-260, the KCC contacts the selectee to obtain copies of the required supporting documents.  *Id.*; 9 FAM 502.6-4(d)(1)(B).  The KCC then reviews all biographical and documentary information for completeness, apparent inconsistencies, and potential indicators of fraud.  *See* ECF No. 39-2 at 2; 9 FAM 502.6-4(d)(1)(B).  Visa numbers are allocated to selectees "who are within the applicable rank cut-off for that month and have been reported documentarily qualified."  9 FAM 502.6-4(c)(2)(C).  A selectee is "documentarily qualified" for purposes of scheduling a visa appointment when the KCC confirms that the applicant has properly completed and submitted the DS-260 and all documents are "received and reviewed."  9 FAM 502.6-4(d)(1)(B).

The KCC contacts documentarily qualified applicants to schedule an interview when their regional lottery rank number is about to become current under the State Department Visa Bulletin.  *See, e.g.*, 9 FAM 502.6-4(d)(2).  Current visa number in hand, the applicant may schedule an

interview with a consular officer, and assuming the selectee meets the criteria to obtain one, the State Department shall issue him a diversity visa.  8 U.S.C. § 1153(c), (e)(1); 22 C.F.R. §§ 40.6, 42.81(a); *see* 8 U.S.C. § 1202(h).  Consulates return unused visa numbers to the State Department at the end of each month so that they may be reassigned, but the State Department stops granting visa numbers altogether once it projects that it will issue all available visas to existing visa number holders.  ECF No. 20 at 9–10.  Because the diversity visa program restarts each fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the selection fiscal year. 8 U.S.C. §§ 1153(c)(1), 1154(a)(1)(I)(ii)(II); 22 C.F.R. § 42.33(a)(1), (d); *see* 31 U.S.C. § 1102. *Almaqrami*, 933 F.3d at 777.  A diversity visa is generally valid for six months after issuance.  8 U.S.C. § 1201(c).

As the government emphasizes—and relevant here—a visa interview is scheduled only if the visa number for the applicant's country, region, and rank order is current per the information in the Visa Bulletin.  ECF No. 20 at 6.  And the availability of interview appointments may depend on the available resources and competing demands of consulates in an applicant's country of residence.  ECF No. 20 at 6.  This is because, "[u]nless otherwise directed by the Department, an alien applying for an immigrant visa shall make application at the consular office having jurisdiction over the alien's place of residence."  22 C.F.R. § 42.61.  Selectees are scheduled in order of their rank number.  *See, e.g.*, ECF No. 20-2 at 3; ECF No. 39-2 at 3 ("This is also why, in addition to eligibility criteria, selection to participate in the DV program is not a guarantee of a visa or a visa interview.").

### B.  The COVID-19 Pandemic and Subsequent Developments

On March 20, 2020, the State Department suspended routine visa services at all U.S. Embassies and Consulates due to COVID-19, but permitted posts to continue providing

"emergency and mission critical visa services" as resources allowed. *Gomez*, 485 F. Supp. 3d at 160; ECF No. 20 at 7.[1]   The State Department did *not* consider processing diversity visa applications for the applicable fiscal year (i.e., fiscal year 2020) to be included in "emergency" or "mission critical services." ECF No. 33 ¶ 328, ECF No. 20 at 7.   Neither were appointments for certain other categories of immigrant visas. *See, e.g.*, ECF No. 20 at 7.   Plaintiffs specifically allege that this exclusion of DV applicants from the "class of 'mission critical' services" lacked a reasoned basis. ECF No. 33 ¶ 399.

On May 1, 2020, defendants released the Diplomacy Strong Framework (or "Diplomacy Strong"), which constituted the State Department's phased approach for resuming in-person operations based on local health and safety conditions. *See, e.g.*, *id.* ¶ 341. Diplomacy Strong has four operational tiers. *Id.* In Phases Zero and One, posts are only permitted to continue processing of emergency and mission-critical cases. *Gomez*, 485 F. Supp. 3d at 161. Phase Two allows for a partial resumption of routine services, while Phase Three permits full resumption. *Id.* Each phase is accompanied by detailed guidance regarding the types of visa categories posts should prioritize for processing. *Id.* On July 14, 2020, the Department placed a notice on its website that U.S. embassies and consulates would begin its phased resumption of routine visa services under the Diplomacy Strong framework. U.S. Dep't of State, Suspension of Routine Visa Services,

---

[1] Mission-critical or emergency services included

> [t]he processing of certain non-immigrant visas such as diplomatic and official visas, H-2 visas associated with food supply, certain medical professionals, air and sea crew and medical emergencies, . . . [and] cases in which an applicant is not protected by the Child Status Protection Act and is at risk of losing eligibility for a visa in his or her current category . . . , spouses and unmarried children of U.S. citizens, as well as visas for adopted children, Afghan and Iraqi Special Immigrant visas, certain medical professionals, and medical emergencies.

*Gomez*, 485 F. Supp. 3d at 160 (alterations in original).

https://travel.state.gov/content/travel/en/News/visasnews/suspension-of-routine-visa-services.html (last visited Aug. 29, 2021).  Thus, between then and March 20, 2020, "[p]osts [did] not have the authority to resume normal visa operations even if the host country ha[d] lifted most restrictions." *Gomez*, 485 F. Supp. 3d at 161.

Additionally, on April 22, 2020, former-President Trump signed Presidential Proclamation 10014, which temporarily suspended the entry of immigrants in the United States pursuant to 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a).  85 Fed. Reg. 23,441 (April 22, 2020).  The Proclamation was subject to certain enumerated exceptions, including that "any alien whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees," remained eligible to seek entry.  85 Fed. Reg. at 23,443 § 2(b)(ix). The Secretaries of State and Homeland Security were tasked with implementing the Proclamation as it applied to visas and entry, respectively, while consular officers were directed to determine whether, "in their discretion, [] an immigrant [] established his or her eligibility for an exception" to the Proclamation.  *Id.* at 23,443 § 3.

The State Department interpreted the Proclamations to suspend not only entry but also the issuance of visas in categories covered under the Proclamations and not subject to one of the enumerated exceptions.  *See* ECF No. 20 at 14; *Gomez*, 485 F. Supp. 3d at 162–63 (discussing the State Department's interpretation).  Accordingly, the State Department instructed consular posts that "[o]nly [visa] applicants that [the] post believes may meet an exception to the [Proclamation], including the national interest exception, *and* that constitute a mission-critical category should be adjudicated at this time." ECF No. 33 at 93.

On June 22, 2020, the President issued Proclamation 10052, which extended Proclamation 10014 through December 31, 2020.  85 Fed. Reg. 38,263, 38,263–67 (June 25, 2020).

As another court in this district explained, selectees for fiscal year 2020 were "doubly doomed" because they were neither treated as "mission critical" under Department guidance nor eligible for processing unless they qualified for an exception to the Proclamations (even at posts that resumed routine processing). *Gomez*, 485 F. Supp. 3d at 164, *see* ECF No. 33 ¶¶ 347 ("In internal communications DOS reiterated to the field that DV applicants remained excluded from 'mission-critical' treatment, and that although DV applicants may theoretically qualify for a NIE or another exemption under any of the Proclamations, 'based on the Department's experience with the DV program, we anticipate that very few DV applicants are likely to be exempt from the PP's suspension or to qualify for a waiver.'"), 365–66,.

On November 12, 2020, the Department provided "updated prioritization guidance" to consular offices to inform decision-making in the resumption of routine services. ECF No. 20-1 at 2. This guidance explains "[a]lthough the Diplomacy Strong framework provides important context and structure, posts are no longer obligated to be in a specific Diplomacy Strong phase to adjudicate a particular visa class as described in prior guidance." ECF No. 20-1 at 10. Instead, the guidance provides the following tiered prioritization guidance for posts:

> Tier One: Immediate relative intercountry adoption visas, age-out cases (cases where the applicant will soon no longer qualify due to their age), and certain Special Immigrant Visas (SQ and SI for Afghan and Iraqi nationals working with the U.S. government)

> Tier Two: Immediate relative visas; fiancé(e) visas; and returning resident visas

> Tier Three: Family preference immigrant visas and SE Special Immigrant Visas for certain employees of the U.S. government abroad

> Tier Four: All other immigrant visas, including employment preference and diversity visas.

ECF No. 20-1 at 11; *see* U.S. Dep't of State, Immigrant Visa Prioritization (last updated Aug. 30, 2021), https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visaprioritization.html.  Though they are to adhere to this system, posts were instructed that "some appointments [should be made] available in each tier, each month."  ECF No. 20-1 at 11.  Notably, this November guidance also explains that "posts should at all times continue to consider" Presidential Proclamations 10014 and 10052 and "prioritize services for applicants not subject to or excepted" from these proclamations while making allowances for applicants who may "qualify for national interest exceptions (NIEs)."  ECF No. 20-1 at 12.

On December 31, 2020, former-President Trump signed Presidential Proclamation 10131, which extended Proclamations 10014 and 10052 until March 31, 2021.  86 Fed. Reg. 417 (Dec. 31, 2020).

### C.  Plaintiffs File The Present Lawsuit Before the Proclamations Are Rescinded

Plaintiffs are diversity visa selectees for fiscal year 2021.  They filed their initial complaint on February 1, 2021.  ECF No. 1.  In it, they alleged that between April 23, 2020 and the time that they filed the present lawsuit, no diversity visa applicant for fiscal year 2021 was scheduled for a visa interview "because no exceptions" to the Presidential Proclamations applied and they are otherwise ineligible under the Diplomacy Strong Framework.  ECF No. 1 ¶ 369.

On February 24, 2021, President Biden revoked Proclamation 10014 and the portions of PPs 10052 and 10131 that apply to immigrant visas.  *See* Proclamation No. 10149, 86 Fed. Reg. 11,847 (Feb. 24, 2021).  The prior Proclamations thus no longer have any effect on the processing of diversity visas for fiscal year 2021.

In their filings responding to plaintiffs' initial complaint, defendants explain that the State Department "resumed processing of DV applications as local COVID-19 conditions permit and in

accordance with the Department's current prioritization guidelines which are not the subject of this lawsuit."  ECF No. 20 at 19.  On February 19, 2021, defendants issued new prioritization guidance in anticipation of the expiration of former-President Trump's Proclamation 10014.  ECF No. 25-1 at 49.  It contains no references to Diplomacy Strong or "mission critical" and instructs posts that, while they should continue to follow the previous (November 2020) prioritization guidance,

> Posts with an IR backlog should still schedule some Family Preference (FP) cases, Employment Preference (EP), and Diversity Visa (DV) cases each month considering the backlog, if any, for each type of case, but allocate at least 75 percent of each month's appointments to backlogged IRs.

*Id.* at 49.[2]

### D.  Plaintiffs Move For a Preliminary Injunction

Undeterred (and without amending their complaint), plaintiffs moved for a preliminary injunction on April 11, 2021, asking this Court to, among other things, preserve their diversity visa eligibility, declare defendants' policies unlawful, and order their applications' adjudication without reference to the challenged policies.  *See* ECF No. 6 at 1.  Plaintiffs acknowledged that President Biden revoked the Presidential Proclamations, but they argued that, in light of defendants' scheduling rate for interviews, it is "clear that [d]efendants continue to apply all of their prior restrictive policies, regulations, and guidance" and are "suspend[ing] most adjudication of diversity visas where no such authority to suspend adjudication exists under the INA."  *Id.* at 10.

---

[2]     In April 2021, defendants publicly announced that the February 2021 guidance would serve as the governing approach for adjudicating visas.  *See, e.g.*, ECF No. 33 ¶ 351.  Plaintiffs do not identify any difference between the identified "April 2021" policies and the guidance announced in February 2021.

On June 21, 2021, this Court denied plaintiffs' motion for a preliminary injunction without prejudice.  ECF No. 30.  While the parties appeared to dispute whether defendants' pandemic guidance from 2020 still governed plaintiffs' application processing, it was *not* disputed that diversity visa application processing had resumed.  *Id.* at 2.  "A plaintiff's request for preliminary injunctive relief must mirror the allegations and relief sought in the complaint," *id.* (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)), and the Court found that "the mismatch between the request for injunctive relief and the complaint complicate[d] the Court's ability to 'meaningfully [] assess' plaintiffs' entitlement to injunctive relief," *id.* at 4 (quoting *Fusari v. Steinberg*, 419 U.S. 379 (1975)).

### E.  Plaintiffs File An Amended Complaint

On June 26, 2021, plaintiffs filed an amended complaint.  ECF No. 33.  In it, they challenge all of defendants' previously discussed policies—the implementation of the Presidential Proclamations, "mission critical," Diplomacy Strong, the November 2020 guidance, the February 2021 (and April 2021) guidance, and their current lack of a diversity visa interview.  First, they allege that defendants acted *ultra vires* and violated the APA when they "implemented the challenged practices, rules, and actions with the specific purpose of harming DV approved petitioners."  *Id.* ¶ 380.  Second, plaintiffs allege that defendants violated the Administrative Procedures Act ("APA"), when defendants "failed to process and adjudicate" plaintiffs' applications, failed to scheduled plaintiffs' interviews, and otherwise failed to respond in any way to plaintiffs' approved diversity visa petitions.  *Id.* at 102.  Doing so, plaintiffs allege, constitutes agency action "unlawfully withheld or unreasonably delayed," which this Court should compel under 5 U.S.C. § 706(1).  *Id.*  Third, they challenge the State Department's implementation of the "mission critical" guidance, the April and June Proclamations, the Diplomacy Strong framework,

as well as the November 2020 and February 2021 COVID-19 prioritization guidance as "unlawful, discriminatory, arbitrary, and capricious." *Id.* ¶ 393. They also allege that defendants violated their rights to Due Process and Equal Protection. *See id.* at 106–08.

Plaintiffs propose several different forms of relief. First, they ask this Court to apply equitable estoppel or tolling against defendants so that the September 30, 2021 deadline will not be applied to plaintiffs' applications. *Id.* at 107. They also request a declaration that defendants "acted in bad faith" towards the named plaintiffs. *Id.* at 108. They ask for a declaration that "the challenged practices and implementations, including but not limited to the 'mission-critical' guidance, the 'Diplomacy Strong' Framework, the 30 April 2021 4-Tiers Prioritization, and the plan and practice of Defendants to 'run out the clock' on the DV2021 program, are unlawful, in bad faith, *ultra vires*, arbitrary and capricious, and/or that they constitute abuse of process." *Id.* Finally, they request an order from this Court that defendants "adjudicate promptly" plaintiffs' pending applications or "implement a rational process for plaintiffs to request consideration for waivers, emergency, and/or expedited visa interview scheduling." *Id.*

### F. Plaintiffs Again Move for a Preliminary Injunction

On June 30, 2021, plaintiffs moved for a "preliminary and/or a permanent injunction." ECF No. 33 at 1. They specifically request that this Court grant the following relief:

> (1) Declare that the challenged practices and implementations, including but not limited to the 'mission-critical' guidance, the 'Diplomacy Strong' Framework, the 30 April 2021 4-Tiers prioritization rule, and the plan and practice of Defendants to 'run out the clock' on the DV2021 program as applied to these Plaintiffs, are unlawful, in bad faith, *ultra vires*, arbitrary and capricious, and/or that they constitute abuse of process[;]

> (2) Order Defendants to adjudicate promptly Plaintiffs' Pending DS260 applications without reference to the challenged policies[;]

(3) Or, in the alternative, order Defendants to implement a rational process for Plaintiffs to request consideration for waivers, interview transfers, emergency, and/or expedited visa interview scheduling[;]

(4) Or in the alternative, preserve the visa eligibility of the Plaintiffs for the duration of this litigation in the exercise of the Court's equitable powers.

ECF No. 35 at 1.  Plaintiffs acknowledge that diversity visa processing has resumed, but argue that current COVID-19 Guidance (as promulgated in November 2020, February 2021, and April 2021) has resulted in "suspend[ing] most adjudication of diversity visas where no such authority to suspend adjudication exists under the INA." *Id.* at 10.  This purported suspension in processing harms plaintiffs because "[e]ven if all DV processing restrictions were lifted immediately, these Plaintiffs would face long odds of having their visas timely given the backlog of cases resulting from the suspension of routine services since 20 March 2020." *Id.* at 11.

On the merits, plaintiffs' motion for a preliminary injunction is based on three overarching legal theories. *First*, plaintiffs argue that defendants' implementation of the Proclamations and COVID-19 guidance violate the INA and APA. *See id.* at 18–31.  Specifically, they contend that defendants' actions are *ultra vires*, "not in accordance with law," and "arbitrary, capricious, [or] an abuse of discretion." *Id.* (alteration in original).  *Second*, they argue that defendants have "unreasonably delayed and unlawfully withheld adjudication" of Plaintiffs' visa applications. *Id.* at 31.  They rely on the APA and INA for these arguments. *Third*, plaintiffs argue that equitable principles require relief for the period that Proclamation 10014 was in effect and no visas were being processed. *See id.* at 34–38.[3]

---

[3] Plaintiffs do not invoke their due process or equal protection claims in their request for injunctive relief.

In their opposition, defendants argue, among other things, that plaintiffs have failed to plead or allege any cognizable claim over which this Court has jurisdiction. ECF No. 39 at 12–17. Defendants argue that plaintiffs' claims are not justiciable because the Proclamations have been revoked, *id.* at 12, the Diplomacy Strong framework and "mission-critical" policies no longer impact the processing of diversity visa applications, *see, e.g.*, *id.* at 12–13. To the extent that plaintiffs challenge current COVID-19 guidance, defendants argue that plaintiffs have failed to satisfy Article III's causation and redressability requirements. *Id.* at 14–17.

In their reply, plaintiffs propose four theories of justiciability. First, they argue that defendants "unlawful suspension of the DV2021 program for five months" reduced the chances that plaintiffs will have their applications adjudicated by the end of the year. ECF No. 41 at 7–8. Next, they point to familial, economic, and emotional harms that they allegedly suffered from defendants' actions. *Id.* at 8. Third, they dispute defendants' statement that "mission critical" and Diplomacy Strong no longer affect visa processing. *Id.* at 9. And they contend that defendants' actions resulted in them not having their visas adjudicated at a time when they were previously eligible. *Id.* at 10. They also dispute whether COVID-19 provides an independent explanation for their harms. *Id.* at 11.

Plaintiffs' motion is now ripe for review.

## LEGAL STANDARDS

### A. Preliminary Injunction

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a party must establish (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in her favor, and (4) that a preliminary

injunction is in the public interest.  *Id.* at 20.  The D.C. Circuit has added a gloss on this standard, requiring the "likelihood of success" to be "substantial."  *E.g.*, *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  And while the D.C. Circuit has not yet decided whether courts ought to evaluate these four factors on a "sliding scale," *see Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018), it has stated that the movant must show that all four factors, taken together, weigh in favor of a preliminary injunction. *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014); *see In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof that all four prongs of preliminary injunction standard are met before injunctive relief can be granted).

Though the party seeking a preliminary injunction may rely on "'evidence that is less complete than in a trial on the merits,' she nevertheless bears the burden of producing credible evidence sufficient to demonstrate her entitlement to injunctive relief."  *Workman v. Bissessar*, 275 F. Supp. 3d 263, 267 (D.D.C. 2017) (quoting *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1022–23 (D.C. Cir. 1998)).  Moreover, the D.C. Circuit has cautioned that a preliminary injunction  "should not work to give a party essentially the full relief he seeks on the merits."  *Dorfmann*, 414 F.2d at 1173 n. 13 (citing *Selchow & Righter Co. v. W. Printing & Lithographing Co.*, 112 F.2d 430 (7th Cir. 1940)); *see Diversified Mortgage Inv'rs v. U.S. Life Ins. Co. of N.Y.*, 544 F.2d 571, 576 (2d Cir. 1976) (collecting cases).  Finally, though courts generally have discretion in granting equitable relief, "equitable discretion must not frustrate Congress's ends." *Boland v. Wasco, Inc.*, 50 F. Supp. 3d 15, 19–20 (D.D.C. 2014) (citing *Albemarle Paper Co. v. Moody*, 442 U.S. 405, 409 (1975)).

### B.  Standing

Not all disputes warrant a lawsuit.  Article III of the United States Constitution limits federal courts' subject-matter jurisdiction to live "cases" and "controversies."  U.S. Const., Art.

III, § 2.   Article III thus prevents federal courts from issuing "advisory opinions" on abstract questions of law.   *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *see also* Richard H. Fallon, Jr. et al., *The Federal Courts and the Federal System* 50 (7th ed. 2015) (calling the advisory-opinion prohibition "an uncontroversial and central element of our understanding of federal judicial power").   As the Supreme Court has explained, "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them."   *Preiser*, 422 U.S. at 401. The litigant invoking jurisdiction "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."   *United States v. Juvenile Male*, 564 U.S. 932, 938 (2011) (per curiam) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)).

To safeguard those jurisdictional limits, the Supreme Court has devised several "justiciability" doctrines that dictate when courts may adjudicate a litigant's grievance.   Fallon et al., *supra*, at 49.   The first relevant doctrine is "standing," which defines the sort of interest a litigant must possess to invoke federal jurisdiction at the suit's outset.   *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992).   To have standing, the litigant must make three showings.   First, he "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical."'"   *Id.* (cleaned up).   To satisfy the concreteness requirement, the complained-of injury must be "*de facto*"; that is, it must exist in the real world.   *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).   When plaintiffs sue based on a "procedural injury"—or the agency's failure to act according to an applicable statutory or regulatory framework—that claim "must be tethered to some concrete interest adversely affected by the procedural deprivation: '[A] procedural right *in vacuo* . . . is insufficient to create Article III standing."   *WildEarth Guardians v. Jewell*, 738

F.3d 298, 305 (D.C. Cir. 2013) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)) (alterations in original).  To satisfy the actual or imminent injury element, the litigant must point to something more than speculative "allegations of possible future injury."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Accordingly, when a plaintiff's theory of harm is that the defendant's actions have increased her risk of future harm, she must be able to show "both (i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914–15 (D.C. Cir. 2015).

Second, the litigant must show that there is a causal connection between the injury and the conduct complained of: "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61.  The D.C. Circuit "has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest."  *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc).  Accordingly, at least one plaintiff must demonstrate that it is "substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest."  *Id.* at 664–65; *see, e.g.*, *Cty. of Delaware, Pa. v. Dep't of Transp.*, 554 F.3d 143, 148 (D.C. Cir. 2009); *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017).

Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560–61.  "A significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered" will suffice for standing.  *Utah v. Evans,* 536 U.S. 452, 464 (2002).

### C. Mootness

Another important justiciability doctrine is mootness.  "Even where litigation poses a live controversy when filed," a federal court must "refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Am. Bar Ass'n v. FTC,* 636 F.3d 641, 645 (D.C. Cir. 2011); *see Conservation Force v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (explaining that a case becomes moot when "the issues are no longer live or the parties lack a legally cognizable interest in the outcome" (citation omitted)).  A plaintiff's concrete and redressable injury-in-fact thus need persist throughout the life of the lawsuit; if the injury vanishes, so too does jurisdiction.  *Spencer*, 523 U.S. at 7.  A suit or claim becomes "moot" when the complained-of injury ceases or no longer can be redressed before the case becomes final.  *Id.*

An exception to the mootness doctrine is the "voluntary cessation" doctrine.  A defendant's voluntary cessation of the challenged activity will, generally, not moot a case unless "the party urging mootness demonstrates that (1) 'there is no reasonable expectation that the alleged violation will recur' and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged violation.'"  *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1074 (D.C. Cir. 2012) (quoting *Nat'l Black Police Ass'n v. District of Columbia,* 108 F.3d 346, 349 (D.C. Cir. 1997)).  However, "[a] challenge to a superseded law is rendered moot unless 'there [is] evidence indicating that the challenged law likely will be reenacted.'"  *Id.*

### ANALYSIS

The Court's analysis of plaintiffs' request for a preliminary injunction starts—and ends—with Article III standing.  Extrapolating from the requirement that a plaintiff seeking a preliminary injunction must show a "substantial likelihood of success on the merits," the D.C. Circuit has held that "a party who seeks a preliminary injunction must show a 'substantial likelihood' of standing."

*Food & Water Watch*, 808 F.3d at 913 (internal quotation marks and citation omitted).   A plaintiff who fails make this showing "is not entitled to a preliminary injunction."   *Id.*; *see Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 (D.C. Cir. 2017).

In their motion for a preliminary injunction, plaintiffs first argue that the Diplomacy Strong framework, "mission critical," and defendants' implementation of the Presidential Proclamations (what they describe as "no visa" policies) violate the APA and are *ultra vires*.   ECF No. 35 at 18–22, 26–31.   They bring a similar challenge to the November 2020 COVID-19 guidance and its subsequent February and April 2021 guidance that currently govern diversity visa processing.  ECF No. 35 at 22–25.   Next, they argue that defendants have violated the APA by unreasonably delaying and unlawfully withholding the processing and adjudication of diversity visa applications.   *See* ECF No. 35 at 31.   Finally, they invoke equitable principles to challenge the former cessation in visa adjudications and prioritization guidance.   ECF No. 35 at 38.

As the following explains, plaintiffs have failed to make the requisite showing at this stage that their claims are justiciable.   First, Diplomacy Strong, "mission critical," and defendants' "no visa" policies implementing the Presidential Proclamations no longer govern diversity visa processing.   Whether analyzing under the APA or INA count, there is nothing for the Court to declare unlawful or enjoin and plaintiffs thus lack standing for these claims.   Second, plaintiffs challenge the "lingering effects" of defendants' former policies and suspension of diversity visa adjudications.   But plaintiffs have failed to show that these former policies and the accompanying suspension have increased the risk of harm to any particular plaintiff.   Third, plaintiffs' remaining claims pertain to the current prioritization policies.   But here too, plaintiffs have failed to identify a particular plaintiff for whom there exists a substantial likelihood that the injury complained of is

fairly traceable to defendants' actions.  Accordingly, the Court must deny plaintiffs' motion for a preliminary injunction.

### A. Justiciability of Claims Pertaining to Former Policies Governing Diversity Visa Processing

Plaintiffs' amended complaint challenges several of defendants' *former* policies governing diversity visa processing.  Indeed, "mission-critical," "Diplomacy Strong," and defendants' implementation of the April and June Proclamations, together resulted in the suspension of diversity visa processing between October 2020 and February 2021.  But as explained above, diversity visa processing has resumed.  Presidential Proclamation 10014 has been revoked—so defendants cannot implement it.  And none of the aforementioned policies currently govern diversity visa processing.

In their motion for a preliminary injunction, plaintiffs argue that they are likely to succeed on the merits of their claims that these policies violate the INA and the APA.  ECF No. 35 at 18–22, 26–31.  They ask for a declaration to this effect and an injunction requiring the adjudication of their diversity visa applications "without reference to the challenged policies."  *Id.* at 1.  But the Court cannot enjoin or declare unlawful policies and practices that no longer affect diversity visa processing.  *See Almaqrami*, 933 F.3d at 783 ("[C]ourts generally cannot declare unlawful or enjoin policies that are no longer in force.").  Plaintiffs have already "obtained all the relief . . . sought," *Conservation Force, Inc.*, 733 F.3d at 1204 (quoting *Monzillo v. Biller*, 735 F.2d 1456, 1459 (D.C. Cir. 1984)); and thus lack a "legally cognizable interest in the outcome," *id.* (quoting *Larsen v. U.S. Navy*, 525 F.3d 1, 3 (D.C. Cir. 2008)).  As there is no ongoing injury for the Court to redress, plaintiffs lack standing to bring these claims.

While plaintiffs acknowledge that the Proclamations have been revoked, they contend that Diplomacy Strong and "mission critical" continue to govern diversity visa processing.  *See, e.g.*,

ECF No. 41 at 9.  The government's filings and affidavits definitively refute these arguments. Neal Vermillion, a State Department employee explains that "[o]n November 12, 2020, the Department provided updated prioritization guidance to all consular posts to inform decision-making as posts attempted to resume full routine services."  ECF No. 20-1 at 2.  That guidance, in turn, states that

> [a]lthough the Diplomacy Strong framework provides important context and structure, posts are no longer obligated to be in a specific Diplomacy Strong phase to adjudicate a particular visa class as described in prior guidance.  The health and safety of consular teams, mission colleagues, and applicants for consular services should guide every decision and action in planning for the resumption of consular services at overseas posts.

ECF No. 25-1 at 3.  Consular officers are to "determine the volume of visa services they are able to resume within strict priority guidelines" laid out in the guidance.  *Id.*  At the time this guidance was issued, President Trump's Presidential Proclamations were still in effect and the posts were instructed to

> continue to consider these Presidential Proclamations and prioritize services for applicants not subject to or excepted from these P.P.s, making allowances as appropriate for emergency and mission critical visa interviews for applicants who may also qualify for national interest exceptions (NIEs).

ECF No. 20-1 at 5.

But the State Department's policy changes did not stop there.  Mr. Vermillion explains that "in anticipation of the expiration of Presidential Proclamation 10014, which had suspended entry of certain immigrant visa applicants, the Department issued updated guidance on February 19, 2021."  ECF No. 20-1 at 2.  The February 2021 guidance provides that, "contingent on the ability of each consular section to accept cases," "consular sections worldwide will resume normal scheduling processes of all immigrant visa (IV) and diversity visa (DV) classifications, for

appointments starting in April 2021." ECF No. 25-1 at 49. The guidance explains how offices should prioritize their services, so that

> posts with an [immediate relative visa ("IR")] backlog should still schedule some Family Preference (FP) cases, Employment Preference (EP), and Diversity Visa (DV) cases each month considering the backlog, if any, for each type of case, but allocate at least 75 percent of each month's appointments to backlogged IRs.

*Id.* Neither the February 2021 (or the April 2021) Department-wide guidance reference "mission-critical" or Diplomacy Strong. *See, e.g.*, ECF No. 25-1 at 53–54. Thus, neither Diplomacy Strong nor "mission critical" affect the processing of diversity visas on a Department-wide basis.

Plaintiffs' arguments to the contrary are meritless. Plaintiffs first rely on two statements from State Department employees. The first comes from Vermillion's declaration that the November guidance was meant to "inform decision-making as posts attempted to resume full routine services." ECF No. 41 at 9. The second comes from another employee, Brenda Grewe, that "[t]he phased resumption of services at each diplomatic post is contingent on local health conditions." *Id.* From these statements, plaintiffs derive the conclusion that the November 2020 guidance was not intended to promote flexibility, but instead serve as a "more rigid prioritization regime" for "consulates [] preparing to enter phase 3 (routine services)." *Id.* In other words, plaintiffs believe that references to a "phased resumption" of "routine services" indicate that Diplomacy Strong and "mission critical" are still in effect. These arguments are nothing more than clever word play. The November 2020 guidance (which is cited by and attached to the Vermillion Declaration) explains that while posts should consider their resources and conditions (as reflected by their Diplomacy Strong phase), "posts are *no longer obligated* to be in a specific Diplomacy Strong phase to adjudicate a particular visa class *as described in prior guidance*." ECF

No. 20-1 at 10 (emphasis added). And in any event, the February 2021 (and April 2021) Guidance contain no references to Diplomacy Strong or "mission critical." *See* ECF No. 25-1 at 49–58.

Plaintiffs also argue that embassies' and consulates' references to "mission critical" when scheduling visa appointments is evidence that these policies are still in effect. *See* ECF No. 9 at 9; ECF No. 45 at 1–2. Not so. Plaintiffs cannot identify any *Department-level* guidance where "mission critical" is applicable. That is the basis of their challenge (no consulate officials are named in this lawsuit). While "mission critical" resulted in the suspension of diversity visa adjudications, *see* ECF No. 33 ¶ 328, defendants' *current* guidance instructs consulates that, even in light of backlogs, they "should still schedule some . . . Diversity Visa (DV) cases each month." ECF No. 25-1 at 49.

Plaintiffs' next two arguments erroneously assume that justiciability of these claims involves an issue of mootness. It doesn't. While both standing and mootness ask whether a case or controversy exists, standing poses this question at start of the litigation, while mootness asks whether that case or controversy exists throughout the duration of the lawsuit. *See, e.g.*, *Brookens v. Am. Fed'n of Gov't Emps.*, 315 F. Supp. 3d 561, 567 (D.D.C. 2018). The Court ordinarily assesses standing from the time that the operative complaint was filed. *See G&E Real Est., Inc. v. Avison Young-Washington, D.C., LLC*, 168 F. Supp. 3d 147, 159–60 (D.D.C. 2016). At the time the amended complaint was filed in this case, diversity visa processing had resumed, and these challenged policies no longer affected processing.

But it makes no difference to the outcome if the Court were to instead apply mootness principles. First, plaintiffs contend that even if these policies no longer impact diversity visa adjudications, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." ECF No. 41 at 13 (quoting

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).  This rule finds its roots in

the rationale that courts should not leave defendants "free to return to [their] old ways."  *Id.* at 289

n.10.  But the D.C. Circuit has explained that "[a] challenge to a superseded law is rendered moot

unless 'there [is] evidence indicating that the challenged law likely will be reenacted.'"  *Initiative*

*& Referendum Inst.*, 685 F.3d at 1074 (alteration in original)) (quoting *Nat'l Black Police Ass'n*,

108 F.3d at 349).  No such evidence is present here.  And other courts in this District and other

Circuits have "consistently recognized that where the defendant is a government actor—and not a

private litigant—there is less concern about the recurrence of objectionable behavior."  *E.g.*,

*Citizens for Resp. and Ethics in Wash. v. SEC*, 858 F. Supp. 2d 51, 61–62 (D.D.C. 2012).

 Nor does plaintiffs' reliance on *Almaqrami* help them.  There, the D.C. Circuit concluded

that plaintiffs' claims were not moot because whether the district court could grant diversity visa

plaintiffs relief after the fiscal year concluded involved a "merits" determination.  *Almaqrami*, 933

F.3d at 781.  The Circuit said the district court's authority to grant relief was "not so implausible

that it [was] insufficient to preserve jurisdiction." *Id.*  But the issue here is whether the Court can

enjoin or declare unlawful rescinded policies—a quintessential example of mootness.  *See id.* at

783.

 To the extent that plaintiffs seek relief from this Court in the form an order enjoining or

otherwise declaring that defendants' "mission-critical," Diplomacy Strong, or Proclamation-

implementing policies are unlawful, such claims are not justiciable because there is no effective

relief that the Court can grant—the policies no longer govern processing.  Without a live case or

controversy over these claims, the Court is without jurisdiction to decide them.

23

**B. Plaintiffs' Standing To Challenge The "Lingering Effects" Of The Suspension Of Diversity Visa Adjudications**

Plaintiffs also argue that they have standing to challenge the "lingering effects" of the suspension of the diversity visa adjudications. Specifically, plaintiffs argue that the cessation in processing between October 2020 and February 2021 has resulted in an increased risk of not obtaining a diversity visa by September 30, 2021. *See, e.g.*, ECF No. 35 at 17 ("The continuing injury is evident and stems from the 'lingering effects' of Defendants' unlawful actions."). In their request for injunctive relief, plaintiffs do not ascribe this theory of standing to any of their particular claims or forms of requested relief. *See, e.g.*, *id.* at 17–18; ECF No. 41 at 7–8.[4]

As far as the Court can tell, this theory of standing appears relevant to plaintiffs' claims brought under § 706(1) (that their adjudications have been unreasonably delayed or unlawfully withheld), their INA and equitable counts, and their standing to request forward-looking equitable remedies. *See Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) (explaining that to obtain forward-looking relief, the plaintiff "must show [she] is suffering an ongoing injury or faces an immediate threat of injury") (citing *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

Standing is "not dispensed in gross." *Davis v. FEC*, 554 U.S. 724, 734 (2008). When there are multiple plaintiffs, at least one must satisfy Article III's requirements by demonstrating that he has standing for *each* claim he seeks to press and for *each* form of relief requested. *See id.* In the context of a preliminary injunction, that plaintiff must "show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info.*

---

[4] In their complaint, plaintiffs articulate this theory of standing in the context of their § 706(2) claim, where they allege in their complaint that "the six month's suspension of the DV2021 program severely harmed Plaintiffs' chances for meaningful participation in the program" and resulted in "backlogs and delays . . . [that] continue to impede Plaintiffs' ability to receive timely adjudication of their pending DS-260 applications." ECF No. 33 ¶ 395. But even if plaintiffs suffered this type of ongoing injury, it is not redressable by the relief sought by plaintiffs in this count—setting aside or declaring unlawful defendants' policy—because these challenged policies no longer affect diversity visa processing. *See supra* pp. 19–23.

*Ctr.*, 878 F.3d at 377 (internal quotation marks and citation omitted).  Accordingly, the plaintiff "cannot rest on mere allegations, but must set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing."  *Id.* (quoting *Lujan*, 504 U.S. at 561).  Applying the "heightened standard" here, plaintiffs have failed to show a substantial likelihood of standing to challenge the lingering effects of the former cessation in diversity visa adjudications.

For the first time in their reply brief, plaintiffs contend that the failure to process diversity visas between October 2020 and February 2021 increased the risk that they will not obtain a diversity visa before the September 30, 2021 deadline.  ECF No. 41 at 7–8.  This may be true.  But the relevant question for the Court is *whose chances* of having their diversity visa processed by the statutory deadline were diminished.  The D.C. Circuit has explained that increased-risk-of-harm cases implicate the requirement that an injury be "actual or imminent."  *See Food & Water Watch*, 808 F.3d at 914.  To satisfy injury-in-fact for purposes of Article III jurisdiction, an injury must be "certainly impending and immediate—not remote, speculative, conjectural, or hypothetical."  *Id.* (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1293 (D.C. Cir. 2007)).  Accordingly, at least one plaintiff must show "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account."  *Pub. Citizen*, 489 F.3d at 1295.

While Plaintiffs may establish standing by demonstrating an increased risk of harm, "[i]n applying the 'substantial' standard," the Court must be "mindful . . . that the constitutional requirement of imminence . . .  necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'"  *Pub. Citizen*, 489 F.3d at 1296.  The D.C. Circuit has instructed that "the proper way to analyze an increased-risk-of-harm claim is to

consider the ultimate alleged harm . . .  as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Food & Water Watch*, 808 F.3d at 915 (quoting *Public Citizen*, 489 F.3d at 1298).

Applying this framework, at least one plaintiff must demonstrate that the former cessation in adjudicating diversity visas substantially increased his or her present risk of not obtaining one of the available 55,000 diversity visas before the end of the fiscal year.  Several facts inform the Court's analysis here.  First, there are 71,817 selectees for the 2021 year, but because each selectee may have derivative applicants, there are a total of 137,969 applicants competing for the 55,000 available diversity visas.  ECF No. 39-2 at 2.  The majority of these applications are adjudicated at a limited number of consulates. *See* ECF No. 20-1 at 2 ("75 percent of all DV-202021 cases designated one of 30 consular posts abroad to process their applications.").  Next, defendants have provided evidence in several of their filings about the effects of COVID-19 on visa processing through all stages of the process. *See, e.g.*, ECF No. 39-2 at 1; ECF No. 39-3; ECF No. 39-4.  The backlog before the pandemic was comprised of approximately 75,000 documentarily qualified immigrant visa applicants. ECF No. 39-4 at 1.  That number is now 536,541 applicants. *Id.* at 2. Indeed, even *after* President Biden revoked former-President Trump's proclamations, and adjudications for several categories of visas resumed, the backlog of eligible immigrant visa applicants awaiting an interview has *continued* to grow. *See id.* at 1–2.  Plaintiffs do not seriously dispute that immigrant visa processing during the pandemic is a zero-sum game with defendants' limited resources.  Processing one category of immigrant visas necessarily results in diminished resources for processing another category of visas.  Indeed, plaintiffs frame their injury as the failure to make interviews "in parity with other visa applicants."  ECF No. 41 at 10.

Whether the suspension of diversity visa adjudications substantially increased the risk to any particular plaintiff also depends on, among other things, the priority number of the particular applicant, whether they were documentarily qualified, and the conditions at the consulate where the selectee's application would be processed.   Of the 59 plaintiffs in this lawsuit, 56 were not eligible to be scheduled for an interview until March 2021.  *See* ECF No. 39-1 at 1–2; ECF No. 29-1 at 1–2.  But by then, the "no visa" policies were no longer in effect.  And applicants with higher visa rank numbers already faced greater odds of having their application adjudicated by the statutory deadline, especially during the pandemic.  Their numbers did not become current until later in the fiscal year, and defendants have explained that applications are ordinarily scheduled by rank number.  ECF No. 39-2 at 3.  Plaintiffs do not grapple with how all these factors necessarily apply to each plaintiff differently.  It is not evident to the Court how these plaintiffs have standing to challenge defendants' former policies.

Plaintiffs provide only limited argument about individual plaintiffs' cases.  For the first time in their reply brief, plaintiffs contend that selectees with rank numbers that were current during the period that adjudications had ceased should have been scheduled for interviews in the same way that the Department scheduled other immigrant visa applicants.  ECF No. 41 at 10.  Only three plaintiffs—selectees from Nepal—had current visa numbers when adjudications were not being scheduled for diversity visa applicants.  *See* ECF No. 29-1 at 2–3; ECF No. 39-1 at 1–2; U.S. Dep't of State, Bureau of Consular Affairs, *Visa Bulletin for February 2021*, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2021/visa-bulletin-for-february-2021.html.[5]  Nepalese plaintiffs Sudip Pun and Moti Danai were documentarily qualified

---

[5] Plaintiffs' initial complaint listed an additional plaintiff (Grishma Dhungel) with a current visa number pending processing in Sydney, Australia.  She was not named in the Amended Complaint and received her diversity visa on April 29, 2021.  *See, e.g.*, ECF No. 29-1 at 4; ECF No. 33.

and had current visa numbers on October 1, 2020.  *See* ECF No. 29-1 at 2–3.  Sarada Archarya Dhakal was documentarily qualified and had a current visa number as of February 1, 2021.  *Id.* at 3.

But defendants have provided affidavits in which they state that visa services at the U.S. Embassy in Kathmandu, Nepal have been seriously limited due to COVID-19.  *See, e.g.*, ECF No. 39-4 at 10.  The government of Nepal imposed a sequence of lockdowns beginning in March 2020 that have continued through the present.  *Id.*  Visa operations were completely suspended from March 2020 until September 2020 due to a nationwide lockdown imposed by the Nepalese government.  *Id.*  In October and November 2020, a surge in COVID-19 cases at the Embassy itself required a drawdown in consular operations as several staff members were infected with COVID-19, and others were quarantined due to symptoms or contact with the infected individuals. *Id.*  Since the end of lockdown in September 2020, staff have ranged from four to nine per day, compared to a full staff of 29 from before the pandemic.  *Id.*  In April 2021, the Embassy experienced another cluster of COVID cases.  *Id.*

At this stage in the litigation, plaintiffs must provide affidavits or other sufficient factual material from which the Court could conclude that, if true, defendants' actions *substantially* increased the risk that plaintiffs Danai, Pun, or Dhakal will not have their visa processed before the statutory deadline.  But it is not even evident from plaintiffs' factual citations that they *would* have been scheduled for an interview absent defendants' actions.  In support of their arguments, plaintiffs cite the increased number of diversity visas (and higher visa numbers) processed in Nepal during September 2020 after Judge Mehta ordered defendants to process a greater number of diversity visas, giving preference to the named plaintiffs in the *Gomez* litigation.  *See* ECF No. 41 at 11–12; *see Gomez v. Trump*, No. 20-cv-1419-APM (D.D.C.), ECF No. 123 at 84–85.  However,

September's statistics do not appear to be a relevant comparator for other months' visa processing numbers.   Indeed, defendants have provided evidence that the Embassy's operations were diminished in the months *following* September because of COVID-19.   *See, e.g.*, ECF No. 39-4 at 10 ("In October 2020 and November 2020, a subsequent surge in COVID cases at the embassy required another drawdown of consular operations.").   And September's adjudication numbers are anomalous for another reason: processing in all other visa categories was substantially (or in some categories, entirely) reduced while defendants attempted to comply with Judge Mehta's order. *Compare* U.S. Dep't of State, Immigrant Visa Issuances by Post September 2020 (FY 2020)[6], *with* U.S. Dep't of State, Immigrant Visa Issuances by Post October 2020 (FY 2020)[7] *and* U.S. Dep't of State, Immigrant Visa Issuances by Post August 2020 (FY 2020).[8]   Without more, it is unclear how the Court could conclude from September's processing statistics that defendants' suspension of diversity visa adjudications *substantially* increased the current risk of harm to the three Nepalese plaintiffs.   And as noted previously, beyond broad generalizations, plaintiffs do not point to any facts demonstrating that any particular plaintiff faces an increased risk of not having his visa adjudicated because of defendants' former policies.   Accordingly, the Court finds that plaintiffs have failed to show a substantial likelihood of standing to challenge the lingering effects of defendants' former policies.

---

[6]    *Available at* https://travel.state.gov/content/dam/visas/Statistics/Immigrant-Statistics/MonthlyIVIssuances/SEPT%202020%20-%20IV%20Issuances%20by%20Post%20and%20Visa%20Class.pdf.

[7]    *Available at* https://travel.state.gov/content/dam/visas/Statistics/Immigrant-Statistics/MonthlyIVIssuances/OCTOBER%202020%20-%20IV%20Issuances%20by%20Post%20and%20Visa%20Class.pdf.

[8]    *Available at* https://travel.state.gov/content/dam/visas/Statistics/Immigrant-Statistics/MonthlyIVIssuances/AUGUST%202020%20-%20IV%20Issuances%20by%20Post%20and%20Visa%20Class.pdf.

### C. Standing To Challenge Current Prioritization Policies

Finally, Plaintiffs challenge the current prioritization policies for processing and adjudicating immigrant visas. But plaintiffs' challenges to the current policies suffer from similar defects to their challenges to the "lingering effects" of defendants' former policies. In the context of their claims and requests for relief, Plaintiffs must identify *who* satisfies the requirements for Article III standing to challenge the current policies. Indeed, while plaintiffs suggest that they *all* have standing to challenge the current prioritization policies, their filings propound several different theories of procedural injury that apply differently to each plaintiff.

The Court has already explained that standing is "not dispensed in gross." *Davis*, 554 U.S. at 734. To the extent that plaintiffs' theory of harm is linked to the failure to receive an interview at the applicable consulate, the points outlined above—that a particular plaintiffs' risk of not receiving a visa implicates factors like rank number, consulate conditions and capabilities, and the effects of COVID-19 on the relevant immigrant visa processing backlogs—are all relevant here. *See supra* pp. 26–28. And as previously explained, each of these considerations necessarily applies to each individual plaintiff differently. To demonstrate injury in fact for purposes of standing, plaintiffs must show that the procedural injury creates "a demonstrable risk . . . or the demonstrable increase of an existing risk" to plaintiffs' "particularized interest[]" in receiving a diversity visa. *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017) (quoting *Fla. Audubon Soc.*, 94 F.3d at 666). Here too, plaintiffs do not explain in their briefing why any individual plaintiff has standing to challenge the current policies in light of these other factors also affecting processing. *See Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n. 4 (D.C. Cir. 2003) (observing that an argument not raised in briefs may be waived).

Even if the Court were to accept the merits of plaintiffs' position that the current prioritization guidance constitutes a current, ongoing procedural injury with *some connection* to their chances of receiving an adjudication, plaintiffs must also satisfy Article III's traceability and redressability requirements.  The D.C. Circuit "has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest."  *Fla. Audubon Soc.*, 94 F.3d at 664.  Accordingly, at least one plaintiff must demonstrate that it is "substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest."  *Id.* at 664–65; *see Cty. of Delaware, Pa.*, 554 F.3d at 148.

But here too, applying the "heightened standard" for evaluating standing, the Court cannot conclude from plaintiffs' submissions that it is substantially probable that defendants' prioritization guidance will result in a *particular* plaintiff not receiving a visa.  Start with the primary plaintiffs discussed in the parties' filings—Danai, Pun, and Dhakal.  Defendants not only have described in affidavits the operational difficulties faced by the post in Kathmandu, Nepal, *see supra* p. 28; ECF No. 39-4 at 10; but they also explain that plaintiff Danai's scheduled interview was subsequently canceled because of a lockdown *imposed by the Nepalese government*, ECF No. 29-1 at 3.  Plaintiffs do not respond to this point.  Ordinarily, an injury is not "'fairly traceable' to the defendant's challenged conduct . . . where the injury depends not only on that conduct, but on independent intervening or additional causal factors."  *See Fulani v. Brady*, 935 F.2d 1324, 1329 (D.C. Cir. 1991).  But even applying a lesser standard of traceability because plaintiffs allege procedural injury, plaintiffs do not provide a sufficient factual predicate from which the Court can conclude, in light of the undisputed evidence, that plaintiffs Dhakal or Pun's interests would be

better protected in the absence of defendants' policies, especially when defendants are unable to schedule interviews because of COVID-19 and related lockdowns imposed by local governments. *See, e.g.*, *Ctr. for Biological Diversity*, 861 F.3d at 184 (explaining that a plaintiff "must still demonstrate a causal connection between the agency action and the alleged injury" by demonstrating a "substantial probability" of harm from the defendant's actions); *Cty. of Delaware, Pa.*, 554 F.3d at 148.

Plaintiffs' amorphous contentions about KCC processing delays are even more attenuated from the ultimate concrete injury of not receiving a visa. For procedural injuries, the Court evaluates traceability in relation to the plaintiff's particularized injury. *Ctr. for Biological Diversity*, 861 F.3d at 183. But here, plaintiffs who are not documentarily qualified must still show traceability when considering not only COVID-19-related factors at the KCC, but also all other previously discussed factors affecting adjudications at consulates. Plaintiffs make no argument in their brief that it is "substantially probable that the procedural breach [at the KCC processing stage] will cause the essential injury to [their] own interest." *Fla. Audubon Soc.*, 94 F.3d at 664–65.[9]

Because plaintiffs have failed to meet their burden with respect to standing, the Court need not consider the remaining preliminary injunction factors. *See Elec. Priv. Info. Ctr.*, 878 F.3d at 375 ("A plaintiff unlikely to have standing is *ipso facto* unlikely to succeed; and when the plaintiff

---

[9] Plaintiffs also argue that they have standing to challenge defendants' "refusal to process Plaintiffs' DS260 applications . . . and the wrongful suspension of DV2021 program for five months" based on "Plaintiffs emotional distress, economic harm, and separation from family members in the United States." ECF No. 41 at 8. As with every other theory of standing put forward by plaintiffs, plaintiffs do not tie this theory of standing to any particular claim or form of requested relief. But at bottom, this theory of standing is another way of framing plaintiffs' alleged past, present, and future injury in not obtaining a diversity visa (which the Court's analysis has already recognized as a concrete interest at stake in this case). Thus, for the same reasons that plaintiffs' other standing arguments are unavailing, so too is their reliance on these particular harms.

is unlikely to succeed, there is no need to consider the remaining factors." (cleaned up)).  A preliminary injunction is an extraordinary remedy.  Plaintiffs have failed to demonstrate their entitlement to one here.

## CONCLUSION

Based on the foregoing, the Court will deny plaintiffs' motion for a preliminary injunction by separate order.

Date:  9/1/21

Royce C. Lamberth
United States District Judge